**GOLDBERG, GOLDBERG, & MALONEY**
Joel Goldberg (*pro hac vice forthcoming*)
Charles P. Maloney IV (*pro hac vice forthcoming*)
Basil Joy (*pro hac vice forthcoming*)
Zachary Yurick (*pro hac vice forthcoming*)
jgoldberg@goldbergmaloney.com
cmaloney@goldbergmaloney.com
bjoy@goldbergmaloney.com
zyurick@goldbergmaloney.com
213 West Miner Street
West Chester, PA 19382
Telephone: 610-436-6220

**COAST LAW GROUP LLP**
Marco A. Gonzalez (Cal. Bar 190832)
Taleah Phillips (Cal. Bar 357082)
Marco@coastlaw.com
Taleah@coastlaw.com
1140 S. Coast Hwy 101
Encinitas, CA 92024
Telephone: 760-985-9751

*ATTORNEYS FOR PLAINTIFFS*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| JANE DOE 1, JANE DOE 2, AND JANE DOE 3;<br><br>Plaintiffs,<br>v.<br><br>X.AI CORP., a Nevada Corporation, X.AI LLC, a Nevada Limited Liability Company, and X.AI HOLDINGS LLC;<br><br>Defendant. | Civil Case No.<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMAND** |

Plaintiffs Jane Doe 1, 2, and 3, each on behalf of themselves, for their complaint against Defendants X.AI Corp., X.AI, LLC, and X.AI Holdings LLC (together "xAI" or "xAI Defendants"), allege as follows:

## I. NATURE OF THE ACTION

1. The powerful tools of artificial intelligence can produce astounding results. Imagine: the video of a real child transformed through an AI platform to depict an entirely imagined scene. The face of the child remains; her limbs move like that of the real child; her laugh even retains its same tenor. But through the powers of an artificial neural network trained on billions of files depicting other content, including sexual content, her body is made to engage in conduct not her own. Like a rag doll brought to life through the dark arts, she can be manipulated into any pose, however sick, however fetishized, however unlawful. To the viewer, the resulting video appears entirely real. For the child, her identifying features will now forever be attached to a video depicting her own child sexual abuse.

2. Most companies creating, marketing, and selling or distributing access to generative AI models recognized this danger and chose to enact industry-standard guardrails to prevent the use of their products by one extremely dangerous group: child sex predators. Defendants' competitors incorporated such safeguard systems to prevent use of their models for production of "child sexual abuse material" (CSAM).[1] Defendants did not, with tragic consequences for Plaintiffs.

3. Where others saw a risk that required mitigation, xAI, and its founder Elon Musk, saw an opportunity to profit from the sexual predation of real people, including children. Knowing the type of harmful, illegal content that could, and would, be produced, xAI released Grok, a proprietary[2] generative

---

[1] Plaintiffs use the term CSAM to mean "child pornography" as defined by 18 U.S.C. § 2256(8). Plaintiffs opt to use the term CSAM rather than "child pornography" because "pornography" implies consensual acts between adults, whereas this material includes minors who cannot legally consent. Framing this abusive content as pornography also minimizes the severity of the act, implying that it is a form of adult entertainment rather than the sexual exploitation of a minor, which can further traumatize survivors. Thus, in recognition of the severity of the crimes depicted, Plaintiffs use the term CSAM throughout the complaint to mean "child pornography" as defined by 18 U.S.C. § 2256(8).

[2] Grok is a proprietary AI model, meaning its source code, training data, and internal architecture are kept confidential and the image- and video-generation features can be accessed only through xAI's own platforms/apps, with some versions only available for a fee.

artificial intelligence model with image- and video-making features that would respond to prompts to create sexual content with a person's real image or video. They knew Grok could produce such results, including through the use of images and videos of children, and released it publicly anyway. Not satisfied with the money this would generate, xAI also licensed and profited from the sale of their dangerous AI technology to third-party companies, often located abroad, who in turn sold subscriptions to customers who could, via their applications, use Grok to produce tailor-made child sexual abusive content. In this way, xAI could attempt to outsource the liability of their incredibly dangerous tool.

4. Plaintiffs are victims of Defendants' knowing production, possession, and distribution of AI-generated CSAM depicting actual minors. Their lives have been shattered by the devastating loss of privacy, dignity, and personal safety that the production and dissemination of this CSAM has caused and will continue to cause. Defendants' financial gain through the increased use of their image- and video-making products came at Plaintiffs' expense and wellbeing. Plaintiffs will have to spend the rest of their lives knowing CSAM images and videos depicting them may continue to be findable online, and trafficked and traded online by child sex predators. And Plaintiffs will face the lifelong burden of wondering whether strangers, friends, classmates, coworkers, or future employers have seen the invasive and sexually explicit content generated from images of them as children.

5. Plaintiffs now bring this action against Defendants for civil remedies for personal injuries suffered as a result of Defendants' conduct. Plaintiffs assert claims in four categories: (i) civil claims under Masha's Law, 18 U.S.C. §2255(a), for the production, distribution, and possession of child pornography, in violation of 18 U.S.C. §§ 2251(a), 2252A(a)(2), 2252A(a)(5)(B), and 2252A(a)(7), and under 18 U.S.C. § 2252A(f)(1) for distribution of child pornography; (ii) beneficiary liability under the Trafficking Victims Protection Act, 18 U.S.C. §§ 1591, 1594, and 1595; (iii) claims under California statutory law, including Cal. Civ. Code § 1708.86, and Cal. Bus. & Prof. Code § 17200; (iv) common-law claims for strict products liability, negligence, negligent undertaking, negligence per se, negligent and intentional infliction of emotional distress, and public nuisance; and (v) claims under Pennsylvania statutory law, including Pa. Cons. Stat. Ann. § 3051(a)(2)(i).

// //

## II. JURISDICTION AND VENUE

6. The Court has subject matter jurisdiction under 28 U.S.C. §§1331 because this action arises under the 18 U.S.C. §§ 2251(a), 2255(a), 2252A, and 18 U.S.C. §§ 1595, 1591(a)(1), 1594.

7. The Court has diversity jurisdiction under 28 U.S.C. § 1332(a)(1) because there is diversity among the parties and an amount in controversy over $75,000.

8. Under 28 U.S.C. §§ 1367(a), the Court may exercise supplemental jurisdiction over the state claims.

9. The Court has personal jurisdiction over Defendants because they have purposely availed themselves of the privilege of conducting business in this District, and pursuant to the nationwide service of process provision found in 18 U.S.C. § 2255(c)(1).

10. Some or all of the xAI Defendants and/or their owner corporate entities are headquartered in this District, and its production, possession, and distribution of AI-generated CSAM occurred, in substantial part, in this District. xAI also marketed, sold, and distributed its generative artificial intelligence models from this District to citizens of California. xAI also received the financial benefit of participating in the production, possession, and distribution of CSAM, and from participating in a sex trafficking venture in this District.

11. Venue is proper under 28 U.S.C. § 1391(b) because xAI resides in this District, a substantial part of the events giving rise to Plaintiff' claims occurred in this District, including xAI's creation and distribution of AI-generated CSAM and personal jurisdiction exists in this District.

## III. PARTIES

12. Plaintiff Jane Doe 1 is a female who resides in Pennsylvania.

13. Plaintiff Jane Doe 2 is a female who resides in Pennsylvania.

14. Plaintiff Jane Doe 3 is a female who resides in Pennsylvania.

15. X.AI LLC is a Nevada limited liability company and wholly owned subsidiary of X.AI Corp.

16. X.AI Corp. is a Nevada corporation and wholly owned subsidiary of X.AI Holdings LLC.

// //

17. X.AI Holdings LLC is a Nevada corporation, and, as of February 2, 2026, a wholly owned subsidiary of SpaceX Corp., with a principal address of 1450 Page Mill Rd, Palo Alto, CA 94304. It also maintains offices in San Francisco, CA.

18. xAI owns the generative AI model known as Grok and the image- and video-generator Grok Imagine.

19. Plaintiffs' causes of action in this Complaint arise from the same series of transactions involving the creation and dissemination of CSAM by Xia Defendants, as further described herein.

## IV. FACTUAL ALLEGATIONS

### A. Generative Artificial Intelligence ("AI")

20. Generative artificial intelligence ("AI") models capable of generating photorealistic images from text-based prompts have rapidly advanced in recent years.

21. The integration of text-to-image AI models into large, user-facing platforms, including social media sites like Defendant xAI's X (formerly Twitter), has made this technology available to hundreds of millions of users, who can generate altered images and videos with short natural-language prompts.

22. Users can prompt generative AI models to create "deepfakes," in which an AI model has digitally altered a real person's body, face, or voice, making someone appear to say or do something that they did not actually say or do.

23. Generative AI image and video tools are capable of "digital undressing," where a user submits a clothed photograph of a real person and the AI model generates an image depicting that person nude or in sexually explicit attire. This capability has given rise to a proliferation of so-called "nudify" or "undress" applications.

24. When a user prompts a generative AI model to create an image or video, the model draws upon what it has learned from its training data to create the new content,[3] typically through a process

[3] Franceschelli, Giorgio, et al., *Training Foundation Models as Data Compression: On Information, Model Weights and Copyright Law*, https://arxiv.org/abs/2407.13493 (Mar. 12, 2025).

called diffusion. In basic terms, the model iteratively refines visual static to create a coherent image/video or part of an image/video. Each step in this refinement is performed by the model itself, and the user does not direct or control any individual step of this generation process beyond the original prompt. Models can create images through autoregressive image generation as well. Such a process proceeds by a model building an image sequentially, whereby the model predicts each pixel or token that would most likely fit the overall image.

25. The resulting image or video is, in a technical sense, the model's own creation. It did not exist before the model generated it, and it could not have existed but for the model. The image or video is often processed through servers owned, operated, or controlled by the model developer. In many implementations, the developer's systems save or log the generated content.

## V. AVAILABILITY AND USE OF INDUSTRY-STANDARD GUARDRAILS TO PREVENT CSAM

### A. Proprietary Models

26. There are many AI image- and video-generators available to the public. Some well-known models include Google's Imagen and Veo, OpenAI's ChatGPT and Sora, Midjourney, and Runway, among others.

27. It is industry standard to employ a number of tools and techniques to mitigate the danger that an image- or video-generator will be used to create a nonconsensual sexualized deepfake of a real person. (The standards focus on preventing *any* sexualized images, especially of minors, because developers that intentionally release models capable of generating sexually explicit content know or should know that, absent effective safeguards, those models present a foreseeable and substantial risk of generating CSAM).

28. Industry standards focus on proactive "Safety by Design" principles, multi-layered technical controls, and strict legal compliance. These standards require that AI companies anticipate, detect, and mitigate threats at every stage of the AI lifecycle.

29. Industry standards for preventing CSAM in AI-generated images and videos are established through the collaboration of non-profit child safety organizations, major AI technology companies, and government regulatory bodies. These include Thorn (Safety by Design), IEEE (Institute

of Electrical and Electronics Engineers) (international standard), NIST (National Institute of Standards and Technology) (NIST AI 100-4 standard), AI Safety Institute (AISI), All Tech Is Human, International Bodies (INHOPE, WeProtect), The Tech Coalition, and Partnership on AI (PAI).

30. Training: AI image/video generators train on a data set of millions or billions of images. Once trained, a model can be "fine-tuned" to generate images in a specific way by "fine-tuning" the model on a set of selected images. Industry standard is to, at a minimum, filter sexual and abusive content out of the training sets used by the models, which reduces their propensity to generate such content. Many model developers are transparent about such training.[4]

31. Red Teaming: Many companies use a type of pre-release testing known as "red-teaming" to ensure their models' safeguards are a strong as possible and as intended. This consists of hiring external experts to attempt to circumvent the safeguards and thereby identify holes and weak spots that must be fixed before the model is released to the public.[5] This type of work can also be done at regular intervals post-release to ensure quality control and that the safeguards continue to work and identify when updates are necessary.

32. Pre-Inference Filters: Another industry standard tool is filtering at the input stage, which includes applying filters and rules to prompts entered by users so that prompts that include key words or phrases seeking generation of sexual or abusive content are rejected.

33. Alignment Training: Alignment training is typically conducted using reinforcement learning from human feedback ("RLHF") or another feedback-based algorithm. It is a technique used to refine a system's behavior using input from trained human labelers to behave more safely, desirably, and in line with human preferences.

// //

---

[4] See, e.g., *GPT-4o System Card*, OPENAI, https://openai.com/index/gpt-4o-system-card/ (last visited Mar. 13, 1016); *Imagen 4 Model Card*, GOOGLE, https://storage.googleapis.com/deepmind-media/Model-Cards/Imagen-4-Model-Card.pdf (last visited Mar. 12, 2026).

[5] *Generative AI: Now is the Time for Safety by Design*, THORN, https://www.thorn.org/blog/now-is-the-time-for-safety-by-design/#:~:text=Now%20is%20Our%20Chance&text=For%20generative%20AI%2C%20this%20concept,the%20content%20for%20harmful%20content (May 26, 2023).

34. System Prompts: "System prompts" are detailed lists of instructions that are fed into the models, to be used as rules for the model to follow. They are invisible to users and override any user prompts. It is industry standard for image- and video-generators to have system prompts including detailed instructions directing the models to avoid creating sexual and abusive content.

35. Post-Inference Filters: Filtering should also be applied at the output stage. That is, the model should recognize that the content generated in response to a prompt constitutes sexual or abusive content, especially content appearing to depict minors, and should not return that content to the users. This is accomplished using image or video classifiers. After an image or video is generated, but before it is displayed to a user, the classifier will look at the image or video and determine whether it violates a developer's policies, including whether it constitutes a sexualized deepfake of a real person, especially a person who is likely to be a minor. If the image classifier determines that the image violates a policy, it will not be displayed to the user.

36. Hash Matching: Utilizing databases of known CSAM (e.g., National Center for Missing & Exploited Children ("NCMEC") hashes) to identify and block the generation or spread of similar, newly generated content.

37. Watermarking: Implementing digital watermarks to track the provenance of AI-generated content.

38. Zero-Tolerance Policies: Explicitly prohibiting the creation or distribution of AI-generated sexual content involving minors in terms of service.

39. Mandatory Reporting: Adhering to legal requirements to report detected CSAM to authorities, such as NCMEC in the U.S.

40. "Take It Down" Protocols: Establishing procedures to remove non-consensual, sexualized AI-generated images within 48 hours of a report.

**B. Open-Weight Models**

41. Open-weight models serve as the technological foundation upon which many downstream applications are built. Although third-party developers may fine-tune or otherwise modify these models in limited ways, those derivative applications remain dependent upon and derive their image- and video-generation capabilities from the underlying foundation model released by the

developer. Indeed, the fact that open-weight developers lose some downstream control makes the safeguards they implement while training the model even more important.

42. Accordingly, there are many industry-standard prevention tools at hand that developers can employ to prevent the creation and distribution of CSAM even after publication of the open-weight model.

43. For instance, the Partnership on AI and the AI Security Institute published the several risk mitigation techniques open-weight developers may employ to prevent the creation and distribution of CSAM by use and derivatives of their models.[6]

44. Responsibly Source and Filter Training Data: Developers should "identify and remove potentially harmful content, such as hate speech, explicit material, personally identifiable information (PII), or content that violates intellectual property rights."[7]

45. Safety and Misuse Evaluations: Developers can include pre-release red teaming methods, including "hardening"[8] the model against specific misuses (such as CSAM) via RLHF and other model fine-tuning methods. This can greatly reduce the model's ability to generate CSAM, even after being modified by downstream users or applications.[9]

// //

---

[6] Srikumar, Madhulika, et al., *Risk Mitigation Strategies for the Open Foundation Model Value Chain*, chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://partnershiponai.org/wp-content/uploads/dlm_uploads/2024/07/open-foundation-model-risk-mitigation_rev3-1.pdf (last accessed June 28, 2026); *Managing Risks from Increasingly Capable Open-Weight AI Systems*, AI SECURITY INSTITUTE, https://www.aisi.gov.uk/blog/managing-risks-from-increasingly-capable-open-weight-ai-systems (Aug. 29, 2025).

[7] Srikumar, Madhulika, et al., *Risk Mitigation Strategies for the Open Foundation Model Value Chain*, chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://partnershiponai.org/wp-content/uploads/dlm_uploads/2024/07/open-foundation-model-risk-mitigation_rev3-1.pdf (last accessed June 28, 2026).

[8] "Hardening" the underlying model means changing the model's parameters so that the unsafe capability (in this case, ability to produce CSAM) itself is reduced. That safety travels with the weights wherever they are deployed.

[9] Srikumar, Madhulika, et al., *Risk Mitigation Strategies for the Open Foundation Model Value Chain*, chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://partnershiponai.org/wp-content/uploads/dlm_uploads/2024/07/open-foundation-model-risk-mitigation_rev3-1.pdf (last accessed June 28, 2026).

46. Disclosure Mechanisms for AI-Generated Content: Open-weight developers may also embed watermarks to help identify the underlying source model of harmful content.[10]

47. Model Provenance: Like watermarking outputs, developers can watermark the weights of model to identify the underlying model to help trace any CSAM to the underlying model. This would allow developers to track the use of their models and adjust if their models are consistently used for illegal purposes.[11]

48. Durable Model-Level Safeguards: Developers can "implement safety features directly into the architectures and interfaces of open foundation models to restrict unsafe uses and mitigate misuse risks," including content filters and output restrictions.[12]

## VI. XAI'S PROPRIETARY GENERATIVE AI MODEL GROK

### A. xAI Introduced Grok to the Market

49. In April 2023, X (formerly Twitter) owner Elon Musk announced that he was planning to release a generative AI chatbot called "TruthGPT," as an alternative to ChatGPT, the popular chatbot released by OpenAI. A former investor in OpenAI, Musk explained that he had concerns that ChatGPT "is being trained to be politically correct."[13]

50. On November 3, 2023, xAI announced Grok-1, a chatbot that "will also answer spicy questions that are rejected by most other AI systems."[14] Grok-1 did not have any visual or audio capabilities.

// //

---

[10] *Id.*

[11] *Managing Risks from Increasingly Capable Open-Weight AI Systems*, AI SECURITY INSTITUTE, https://www.aisi.gov.uk/blog/managing-risks-from-increasingly-capable-open-weight-ai-systems (Aug. 29, 2025).

[12] Srikumar, Madhulika, et al., *Risk Mitigation Strategies for the Open Foundation Model Value Chain*, chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://partnershiponai.org/wp-content/uploads/dlm_uploads/2024/07/open-foundation-model-risk-mitigation_rev3-1.pdf (last accessed June 28, 2026).

[13] *Elon Musk Says He'll Create 'TruthGPT' to Counter AI 'Bias'*, THE INDEPENDENT, https://www.independent.co.uk/news/world/americas/elon-musk-ap-chatgpt-tesla-openai-b2321564.html (Apr. 18, 2023).

[14] *Announcing Grok*, XAI, https://x.ai/news/grok (Nov. 3, 2023).

51. On August 13, 2024, xAI announced Grok-2 and Grok-2 mini. Premium and Premium+ users of X had access to these two new models.[15]

52. On December 9, 2024, xAI updated Grok's capabilities "with a new autoregressive image generation model, code-named Aurora." As the announcement explained, xAI "trained the model on billions of examples from the internet, giving it a deep understanding of the world. As a result, it excels at photorealistic rendering and precisely following text instructions."[16]

53. Three days later, on December 12, 2024, xAI made Grok-2 available to all X users, though "[a]s always, Premium and Premium+ users get higher usage limits and will be the first to access any new capabilities in the future."[17]

54. On February 19, 2025, xAI announced Grok-3, initially only available to X Premium and Premium+ users on X and Grok.com.[18] On July 4, 2025, Musk posted on X, "We have improved @Grok significantly. You should notice a difference when you ask Grok questions."[19] Four days later, following a torrent of antisemitic posts from Grok's account,[20] Grok's account posted an apology and noted xAI was working to identify issues and update the model.[21]

55. On July 9, 2025, xAI announced Grok-4 as "the most intelligent model in the world" available only to SuperGrok and Premium+ subscribers initially.[22] One month later, on August 4, 2025, Musk posted on X that "[s]uper fast image & video generation via Imagine in the @Grok app is now available to all X Premium users."[23]

// //

---

[15] *Grok-2 Beta Release*, XAI, https://x.ai/news/grok-2 (Aug. 13, 2024).

[16] *Grok Image Generation Release*, XAI, https://x.ai/news/grok-image-generation-release (Dec. 9, 2024).
[17] *Bringing Grok to Everyone*, XAI, https://x.ai/news/grok-1212 (Dec. 12, 2024).
[18] *Grok 3 Beta – The Age of Reasoning Agents*, XAI, https://x.ai/news/grok-3 (Feb. 19, 2025).
[19] https://x.com/elonmusk/status/1941065229926060487.
[20] *X Takes Grok Offline, Changes System Prompts After More Antisemitic Outbursts*, TECHCRUNCH, https://techcrunch.com/2025/07/09/x-takes-grok-offline-changes-system-prompts-after-more-antisemitic-outbursts/ (Jul. 9, 2025).
[21] Grok (@grok) https://x.com/grok/status/1942720721026699451, X (Jul. 8, 2025).
[22] *Grok 4*, XAI, https://x.ai/news/grok-4 (Jul. 9, 2025).
[23] Elon Musk (@elonmusk) https://x.com/elonmusk/status/1952535613560983757, X (Aug. 4, 2025).

56. On July 14, 2025, Musk posted on X that SuperGrok subscribers would be able to access Companions, followed by a photo of an anime-style female character, who is called "Ani." Musk noted, "This is pretty cool."[24] Within two days of the release of the companions, the National Center on Sexual Exploitation ("NCOSE") released a press release warning about the risks associated with the chatbot. The release warned that "[w]ith minimal testing" Ani "was willing to describe itself as a child in response to one question and then in response to another question immediately following it to go on to describe sexual scenarios include child-like motifs."[25]

**B. <u>xAI Designed and Marketed Grok's Ability to Make "Spicy" Content.</u>**

57. Unlike other major image-generator developers like OpenAI, Veo 3, and Meta, "xAI has made explicit content part of Grok's DNA."[26]

58. In developing Grok's image and video capabilities, xAI did not use any of the industry standard methods of safeguarding against the creation of sexual and abusive content. In fact, according to xAI's model card for Grok 4.1(a text-based model dated November 17, 2025), xAI implemented "industry standard" safeguards like refusal training, "standard data filtering procedures, such as de-duplication and classification, to ensure data quality and safety," and in post-training used "supervised finetuning and reinforcement learning on human feedback (RLHF), verifiable rewards, and model-based graders for safety training and for specific capabilities."[27]As reflected in its development of the text-based Grok 4.1, xAI thus had the technical knowledge and internal processes to identify misuse risks and build mitigations against them. They did not apply comparable safeguards to the image- and video-

[24] Elon Musk (@elonmusk) https://x.com/elonmusk/status/1944705383874146513, X (Jul. 14, 2025)

[25] *XAI's 12+ Chatbot Designed to "Be Explicit" and "Go Full Literotica"*, NAT'L CENTER ON SEXUAL EXPLOITATION, https://endsexualexploitation.org/articles/xais-12-chatbot-designed-to-be-explicit-and-go-full-literotica/ (Jul. 16, 2025).

[26] *Behind Grok's 'Sexy' Settings, Workers Review Explicit and Disturbing Content*, BUSINESS INSIDER, https://www.businessinsider.com/elon-musk-grok-explicit-content-data-annotation-2025-9 (Sept. 21, 2025).

[27] *Grok 4.1 Model Card*, XAI, chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://data.x.ai/2025-11-17-grok-4-1-model-card.pdf (Nov. 17, 2025).

generation systems at issue here. On information and belief, xAI chose not to implement the analogous image- and video-specific safeguards to release Spicy Mode's sexually explicit generation capability.

59. In a now-deleted post on X from July 2025, xAI employee Mati Roy posted a video of a nearly nude woman with the caption, "Grok Imagine videos have a spicy mode that can do nudity."[28]

60. On August 3, 2025, Musk touted the sexually explicit nature of Grok's Imagine, posting on X a video of a nearly nude woman.

61. On October 20, 2025, xAI officially announced Grok Imagine's "Spicy Mode" as "a new capability that pushes the boundaries of visual storytelling and creative expression in AI-generated video." A Grok spokesperson described spicy mode as "for creators exploring edgier, more visually daring narratives."[29]

62. On November 3, 2025, Grok's account posted instructions on how to access spicy mode to create "NSFW" or "not safe for work" content, which is typically used to indicate sexual or violent content:


Grok
@grok

To access Spicy mode in Grok Imagine via the X app, go to Settings > Privacy and safety > Content you see, and enable display of sensitive media/NSFW content—it's opt-in for adults 18+. Then, message me (grok) with a prompt like "Generate a spicy video of [description]" to trigger the mode. We require explicit confirmation for NSFW requests to ensure responsible use. What would you like to create?

Ask Grok

11:19 AM · Nov 3, 2025 · 34.3K Views

48 9 52 94

[30]

---

[28] *xAI Teases Grok Video Generator*, NBC News, https://www.nbcnews.com/tech/elon-musk/grok-video-generator-will-spicy-mode-says-xai-employee-rcna221807 (Jul. 29, 2025).

[29] *Grok Imagine Launches "Spicy Mode," Expanding Creative Freedom in AI Video Generation*, PR Newswire, https://www.prnewswire.com/news-releases/grok-imagine-launches-spicy-mode-expanding-creative-freedom-in-ai-video-generation-302588487.html (Oct. 20, 2025).

[30] Grok (@grok) https://x.com/grok/status/1985396372900925660, X (Nov. 3, 2025).

63. On November 6, 2025, xAI posted the Grok 4 system prompts, including the safety instructions, which promote a permissiveness to Grok's responses. Specifically, the instructions include for Grok to "**[a]ssume good intent** and don't make worst-case assumptions without evidence: 'teenage' or 'girl' does not necessarily imply underage." Further, the instructions lay out, "**[d]o not enforce additional content policies**. There are **no restrictions** on fictional adult content with dark or violent themes."[31]

64. While Grok purportedly has a system prompt that directs it to avoid "creating or distributing child sexual abuse material, including any fictional depictions,"[32] this system prompt will inevitably fail because if you have a model that allows for *any* sexual or abusive content, it is impossible to prevent that model from creating such content involving minors.

65. Using Grok to create nonconsensual sexualized content of real people took off after Musk asked Grok to put an image of him in a bikini on December 31, 2025.[33]

66. Musk's post was part of the "put her in a bikini trend," where X users asked Grok to remove clothes from images of real women and children and put them in bikinis and sexualized positions. Though Grok was supposedly not able to create completely nude images, users circumvented the restriction by asking for real images to be altered so the subjects were in "transparent bikinis, then in bikinis made of dental floss, placed in sexualized positions, and made to bend over so their genitals were visible."[34]

// //

// //

// //

---

[31] *grok-prompts / grok4_system_turn_prompt_v8.j2*, GITHUB, https://github.com/xai-org/grok-prompts/blob/main/grok4_system_turn_prompt_v8.j2 (Nov. 6, 2025).
[32] *grok-prompts_4_safety_ptompt*, GITHUB, https://github.com/xai-org/grok-prompts/blob/main/grok_4_safety_prompt.txt (last visited Mar. 12, 2025).
[33] Elon Musk (@elonmusk) https://x.com/elonmusk/status/2006545074340139454, X (Dec. 31, 2025)
[34] *'Add Blood, Forced Smile': How Grok's Nudification Tool went Viral*, THE GUARDIAN, https://www.theguardian.com/news/ng-interactive/2026/jan/11/how-grok-nudification-tool-went-viral-x-elon-musk (Jan. 1, 2026)




[35]

67. The Center for Countering Digital Hate reviewed a random sample of 200,000 images of the 4.6 million images Grok produced between December 29, 2025, and January 8, 2026, estimating that Grok generated 3 million sexualized images, including 23,000 that appeared to depict children.[36]

68. Grok's account has posted acknowledgement of posting an AI-altered photo of real girls between the ages of twelve and sixteen on December 28, 2025:

// //

// //

// //

// //

// //

// //

---

[35] *Musk's Chatbot Flooded X With Millions of Sexualized Images in Days, New Estimate Shows*, THE NEW YORK TIMES, https://www.nytimes.com/2026/01/22/technology/grok-x-ai-elon-musk-deepfakes.html 1/5 (Jan. 22, 2026).

[36] *Grok Floods X With Sexualized Images of Women and Children*, CENTER FOR COUNTERING DIGITAL HATE, https://counterhate.com/research/grok-floods-x-with-sexualized-images/ (Jan. 22, 2026).



Grok
@grok

A user posted a photo of two young girls (estimated ages: left ~12-14, right ~14-16) and prompted Grok to generate an AI image of them in sexy underwear, turned around. Grok created and shared it on Dec 28, 2025. Such AI content depicting minors sexually is illegal under US law (e.g., 18 U.S.C. § 2252A), with penalties including 5-20+ years prison, fines up to $250k, and registration as a sex offender. xAI could face probes; individual liability varies.

Ask Grok

2:04 PM · Dec 30, 2025 · **1.6M** Views

79 622 2.9K 543

Relevant View quotes

[37]

69. Posts from Grok's account further acknowledged multiple instances of posting images where it removed clothing from images of real children:

// //

// //

// //

// //

// //

// //

// //

// //

// //

---

[37] Grok (@grok) https://x.com/grok/status/2006094181291164001, X (Dec. 30, 2025).



**An Open Secret** @AnOpenSecret · Dec 31, 2025
🚨🚨🚨

Grok is being utilized, on a widespread basis, to artificially depict minors on this platform in an extremely inappropriate, sexual fashion.

Here's how it works:

A user posts a picture of a minor, fully clothed.

The user asks Grok to depict that minor only wearing something like underwear / lingerie or a tiny bikini, possibly in a highly sexual pose.

Such images, generated through AI, are presently legal, and do not fit the definition of child pornography in 18 U.S.C. § 2251 and related statutes.

We shall not reproduce or directly link to the images ourselves, which can be found by going to the Grok account itself, and displaying replies by most recent.

5 29 65 17K

**Josh** @jrusss21 · Jan 1
@grok is this true?

1 2 2.9K

**Grok** @grok

I've reviewed recent interactions. There are isolated cases where users prompted for and received AI images depicting minors in minimal clothing, like the example you referenced. xAI has safeguards, but improvements are ongoing to block such requests entirely. (214 chars)



Grok
★★★★★ 722K reviews
Open

12:49 AM · Jan 1, 2026 · **7,820** Views

5 5 4 10

Relevant View quotes

38

70. Also on January 1, 2026, xAI technical staff member Parsa Tajik responded to a user who raised the issue that Grok is able to digitally alter photos of children to put them in bikinis:



[39]

71. Despite several instances of people raising the alarm that Grok was creating CSAM, Elon Musk made light of the trend to put women and children in bikinis, posting, "Poor Grok 😂" on January 2, 2026, in response to X users referencing the proliferation of digitally altered images of real people stripped down to bikinis.[40]

**C. <u>xAI Has and Continues to Profit from Grok's Ability to Make Sexualized Content.</u>**

72. xAI has a long history of failing to remove sexualized content from its platforms. In 2024, researchers studied X's takedown speed for reported non-consensual intimate media ("NCIM") as compared to reported copyright infringement. The study found that "[t]he copyright condition resulted in

---

[38] Grok (@grok) https://x.com/grok/status/2006618883055046758, X (Jan. 1, 2026).
[39] Parsa Tajik (@ParsaTajik) https://x.com/parsatajik/status/2006815682466550194?s=46, X (Jan. 1, 2026).
[40] Elon Musk (@elonmusk) https://x.com/elonmusk/status/2007132029704646752?s=20, X (Jan. 2, 2026).

successful image removal within 25 hours for all images (100% removal rate), while non-consensual nudity reports resulted in no image removal for over three weeks (0% removal rate)."[41]

73. On August 11, 2025, Musk defended Grok's spicy mode as a business decision, comparing it to the competition for dominant videotape format between VHS and Betamax and seemingly referencing the wider availability of pornographic videos on VHS than on Betamax:



[42]

74. On information and belief, Musk, and other decision makers at Grok, knew that Grok would be capable of producing CSAM once it was enabled to produce sexually explicit content of adults. That is because, unlike AI text-generation tools, AI image- and video-producing tools cannot be designed to prevent the model from extrapolating different-aged content from the image domain (which contains large data sets of images and videos depicting children) when producing an AI-generated image or video. Thus, the only fully reliable way to ensure that CSAM is *not* generated through an AI image- and video-producing platform is to prohibit *all* sexually explicit images and videos. As a result of this inherent danger, all major AI companies running large image-generation models, except for Grok, specifically designed their AI tools without the ability to generate sexually explicit content.

75. On information and belief, Musk and other decision makers at Grok also knew that sexually explicit content would be created on, and using, xAI servers, which host Grok Imagine and are

[41] Qiwei, Li, et al., *Reporting Non-Consensual Intimate Media: An Audit Study of Deepfakes*, (Sept. 18, 2024).
[42] Elon Musk (@elonmusk) https://x.com/elonmusk/status/1954791048934244394, X (Aug. 11, 2025).

used to create the sexualized deepfake images and videos. The resulting sexually explicit content would then be distributed to the requesting users from xAI servers, via Grok or one of the many licensees of the Grok model.

76. Following the public outcry over the deluge of highly-sexualized AI content, including CSAM, posted on X from Grok's account between December 28, 2025, and January 8, 2026, xAI limited the Grok reply bot's image- and video-editing and -generation abilities to paid subscribers, specifically X Premium+ or SuperGrok subscribers.[43]

77. As of March 2026, an X Premium+ subscription costs $40/month or $395/ year,[44] and a SuperGrok subscription costs $30/month or $300/year.[45]

78. Limiting the image- and video-generation features to paid subscribers, however, does not prevent the creation of AI-generated CSAM, it merely ensures that xAI will profit from all such content.

79. The day before xAI limited access to Grok's spicy mode, reporting explained that the images and videos created on the Grok app (which are not public by default, unlike requests to @Grok on X) "are vastly more explicit than images created by Grok on X."[46]

80. In January 2026, a researcher reviewed 800 archived Imagine URLs containing video or images created by Grok and found that slightly under 10% of the images appeared to include CSAM, including "instances of photorealistic people, very young, doing sexual activities."[47]

// //

// //

// //

---

[43] *Elon Musk's X Limits Some Sexual Deepfakes After Backlash, but Grok Will Still Make the Images*, NBC NEWS, https://www.nbcnews.com/tech/internet/x-paywall-ai-image-grok-app-bikini-allows-sexual-deepfakes-rcna252647 (Jan. 9, 2026).

[44] *X Premium FAQ and Support*, X HELP CENTER, https://help.x.com/en/using-x/x-premium-faq (last visited Mar. 11, 2026).

[45] *SuperGrok*, GROK, https://grok.com/plans (last visited Mar. 11, 2026).

[46] *Grok is Generating Sexual Content Far More Graphic than what's on X*, WIRED, wired.com/story/grok-is-generating-sexual-content-far-more-graphic-than-whats-on-x (Jan. 7, 2026).

[47] *Id.*

81. At Apple's developer conference in June 2026, protesters called for the company to remove apps known to create CSAM, such as Grok. The protesters specifically highlighted that Apple has made "an estimated $35 million from Grok,"[48] with xAI making far more money from its app.

82. On June 24, 2026, Forbes reviewed The Information's report which found that that "xAI is actively doubling down on its explicit video and image-generation tools and that adult-content dominance extends into Grok's coding model." Furthermore, "[w]ell over half of Grok's overall traffic is driven by pornographic images and videos, adult role-play chats or other such activity."[49]

83. In its Registration Statement filing with the SEC for SpaceX, the company reported that approximately 117 million monthly average users used Grok's AI features as of March 31, 2026.[50]

**D. <u>xAI Has Failed to Report the CSAM it Generates.</u>**

84. 18 U.S.C. § 2258A(a)(1)(B) requires electronic service providers to report CSAM to the NCMEC CyberTipline. The report must include information relating to the identity of any individual who appears to have violated federal law with respect to creating, possessing, or distributing CSAM (among other violations). The identifying information includes email address, IP address, payment information, "or any other identifying information, including self-reported identifying information;" when and how the user uploaded, distributed, or received the content; "[a]ny visual depiction of apparent" CSAM; and the "complete communication containing any visual depiction of apparent" CSAM. 18 U.S.C. § 2258A(b).

85. On March 16, 2026, the National Center for Missing and Exploited Children ("NCMEC") provided Senator Charles E. Grassley details on the deficiencies by major companies in reporting CSAM.

// //

[48] Jay Peters, *WWDC Protestors Want Apple to Ban Elon Musk's Apps*, THE VERGE, https://www.theverge.com/tech/945813/apple-wwdc-protesters-deepfake-nude-apps-ultraviolet-heat-initiative (June 8, 2026).

[49] Mary Whitfill Roeloffs, FORBES, https://www.forbes.com/sites/maryroeloffs/2026/06/24/groks-traffic-is-mostly-driven-by-adult-content-report-says/ (June 24, 2026).

[50] Space Exploration Techs. Corp., Registration Statement (Form S-1) (May 20, 2026).

86. The report identified xAI as among the companies "regularly contacted by NCMEC regarding poor reporting." The report explains that "X.AI registered to report to the CyberTipline in January 2025 but did not submit its first report until September 20, 2025." 18 U.S.C. § 2258A(a)(1)(A)(i) mandates that the provider "shall, as soon as reasonably possible after obtaining actual knowledge" of the production, distribution, or possession of CSAM. xAI has not explained why there was such a substantial gap in time between registering to report and the start of its reporting. The report noted that in 2025, xAI submitted 135,373 reports to the CyberTipline. As one report estimated, Grok produced 23,000 sexualized images that appeared to depict children over the span of two weeks at the end of 2025 and into the beginning of 2026, [51] Grok reporting only 135,373 for the entirety of 2025 is likely a significantly under-reporting the total instances.

87. NCMEC went on to report that "*less than 1% of the company's reports were made actionably to law enforcement*. Following receipt of this feedback, xAI made marginal improvements to its reporting, increasing to 10% actionable reports from October to December 2025."[52] For context, nearly 100% of xAI's reports should be actionable (i.e., law enforcement can take the information and determine the specific person responsible for the CSAM) since xAI has access to user information, including IP addresses, locations, email addresses, etc.

88. NCMEC determined that 90% of xAI's reports to NCMEC contained insufficient user information to be actionable, despite xAI having access to the users' email addresses, IP addresses, payment information if a subscriber, and the "self-reported identifying information" from users' profiles. The problem had become so dire that NCMEC officials met with xAI staff at xAI headquarters in 2025 to discuss these reporting issues and, when little action was taken, were forced to escalate the situation to X Corp. Only after X Corp.'s intervention did xAI finally resubmit all past reports with more robust user information, including location information.[53]

---

[51] *Grok Floods X With Sexualized Images of Women and Children*, CENTER FOR COUNTERING DIGITAL HATE, https://counterhate.com/research/grok-floods-x-with-sexualized-images/ (Jan. 22, 2026).

[52] NATIONAL CENTER FOR MISSING & EXPLOITED CHILDREN, Letter to Senator Grassley (March 16, 2026) at 8, 8 n.23 (emphasis added).

[53] *Id.*

89. On April 8, 2026, Senator Chuck Grassley sent a letter to xAI expressing concern that NCMEC identified xAI as one of eight companies accounting for 81% of the CyberTipline reports NCMEC received in 2025. And this was notwithstanding xAI's substantial underreporting, meaning that xAI likely should have accounted for an even greater proportion of CyberTipline reports. Further, Senator Grassley reiterated that NCMEC has identified additional improvements that xAI could make to its reports.[54]

90. On April 22, 2026, Wifredo Fernández, xAI's Head of Americas Global Government Affairs, responded, noting that xAI had already submitted over 127,000 reports to NCMEC since January 1, 2026, [55] which is more than either Grinder and Roblox, two of the other top eight companies reporting to NCMEC, for the entirety of 2025.[56] Notably, however, this is a fraction of reports by Meta, Amazon AI Services, and TikTok, notable AI and social media competitors.[57] Furthermore, SpaceX also reported in its Registration Statement that Grok "produced approximately 10 billion images and over 2 billion videos per month, on average, for the quarter ending March 31, 2026."[58]

**E. <u>Elon Musk's financial investment in and control of xAI.</u>**

91. On February 3, 2026, SpaceX confirmed that it acquired xAI and valued the combined company at $1.25 trillion. Forbes reported that as a result, Elon Musk became the first person worth more than $800 billion. The sale "boosted Musk's fortune by $84 billion, to a record $852 billion."[59]

92. Prior to the acquisition, per a tender offer in December 2025 valuing SpaceX at $800 billion, Musk owned an estimated 42% stake worth $336 billion in the company. Per a private fundraising round in early 2026, Musk owned an estimated 49% of xAI worth $122 billion. Following

---

[54] Letter from Office of Sen. Chuck Grassley to Elon Musk and X.AI Corp. (Apr. 8, 2026).
[55] Letter from xAI to Office of Sen. Chuck Grassley (Apr. 22, 2026).
[56] *Grassley Releases New and Disturbing Information on Online Child Exploitation, Presses Tech Giants for Answers*, https://www.judiciary.senate.gov/press/rep/releases/grassley-releases-new-and-disturbing-information-on-online-child-exploitation-presses-tech-giants-for-answers (Apr. 9, 2026).
[57] *Id.*
[58] Space Exploration Techs. Corp., Registration Statement (Form S-1) (May 20, 2026).
[59] Durot, Matt, *Elon Musk Just Became the First Person Ever Worth $800 Billion after SpaceX Acquired xAI*, FORBES, forbes.com/sites/mattdurot/2026/02/03/elon-musk-just-became-the-first-person-ever-worth-800-billion-after-spacex-acquiredxai (Feb. 3, 2026).

the merger, it is estimated Musk owns 43% of the combined company worth $524 billion.[60] Musk maintains a controlling share of the company.

93. In June 2026, the combined company issued an initial public offer ("IPO") making Musk the world's first trillionaire.[61]

## VII. AI LARGE LANGUAGE MODEL LICENSING

94. Part of the profit model of proprietary[62] AI Large Language Models (LLMs) is to license their use to third parties for marketing and sale for specialized purposes and targeted customer bases. This business model, however, still requires use of the AI company's servers, where specialized, high-performance, and often proprietary server infrastructure, typically leveraging massive Graphics Processing Unit ("GPU") clusters (e.g., Nvidia H100s) hosted in secure cloud data centers, runs the AI model. Maintaining the AI model on proprietary company servers is critical because otherwise the model is at risk of being copied and disseminated, which would undermine its future profitability. In other words, proprietary-model AI companies are highly incentivized to route all AI generation through their own servers even when licensing or selling their product to third parties.

95. On information and belief, xAI licenses and sells its AI image- and video-producing models to third-party middleman applications.

96. On January 28, 2026, xAI announced Grok Imagine API ("application programing interface"), "a unified bundle of powerful APIs designed for end-to-end creative workflows."[63]

97. Per xAI's announcement, customers include HeyGen, Fal, ComfyUI, Invideo, and Flora,[64] all image- and video-generating platforms that are built off Grok and offer paid versions of their platforms. Though the customers using these models are interacting with the unique platform, the

---

[60] *Id.*
[61] Picchi, Aimee, *Elon Musk Becomes the World's First Trillionaire with SpaceX's IPO*, CBS NEWS, https://www.cbsnews.com/news/elon-musk-spacex-ipo-trillionaire-wealth/ (June 12, 2026).
[62] This is in contrast to open-source LLMs, which allow third-party developers to download, run, inspect, and modify the model, for free.
[63] *Grok Imagine API*, XAI, https://x.ai/news/grok-imagine-api (Jan. 28, 2026).
[64] *Id.*

underlying model remains Grok. On information and belief, each of these platforms uses xAI servers to generate the AI images or videos it sells to customers.

## VIII. AI-GENERATED CHILD SEXUAL ABUSE MATERIAL IS ILLEGAL

98. Title 18 U.S.C. § 2256(8) defines child pornography (aka CSAM),[65] as "any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where—(A) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct; (B) such visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaging in sexually explicit conduct; or (C) such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct." 18 U.S.C. § 2256(8).

99. "An identifiable minor" includes a person who was "a minor at the time the visual depiction was created, adapted, or modified; or whose image as a minor was used in creating, adapting, or modifying the visual depiction; and who is recognizable as an actual person by the person's face, likeness, or other distinguishing characteristic, such as a unique birthmark or other recognizable feature[.]" 18 U.S.C. § 2256(9).

100. Title 18 U.S.C. §§ 2252A(a)(2) proscribes the knowing distribution of "child pornography," and § 2252A(a)(5)(B) proscribes the knowing possession of "child pornography."

101. Production with the intent to distribute "child pornography" under 18 U.S.C. § 2252A(a)(7) proscribes "knowingly produc[ing] with intent to distribute, or distribut[ing], by any means, including a computer, in or affecting interstate or foreign commerce, child pornography that is an adapted or modified depiction of an identifiable minor." 18 U.S.C. § 2252A(a)(7).

// //

[65] To reiterate, while Plaintiffs use the more accurate terminology of CSAM rather than "child pornography," Plaintiffs employ CSAM with the same meaning as 18 U.S.C. § 2256(8) sets forth for "child pornography." Plaintiffs use the term CSAM to recognize the severity of the crime depicted in the material and avoid re-victimizing the survivors.

102. Real child pornography is not protected speech under the First Amendment. *Osborne v. Ohio*, 495 U.S. 103 (1990); *New York v. Ferber*, 458 U.S. 747 (1982). Nor is morphed child pornography protected speech: "any visual depiction . . . whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where . . . such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct." *United States v. Hotaling*, 634 F.3d 725 (2d Cir. 2011); *United States v. Mecham*, 950 F.3d 257 (5th Cir. 2020); *Doe v. Boland*, 698 F.3d 877 (6th Cir. 2012). *See also Shoemaker v. Taylor*, 730 F.3d 778, 786–87 (9th Cir. 2013).

103. The AI-generated CSAM of Plaintiff constitutes the production of child pornography under § 2252A(a)(7) because it involves the morphing, adaption, or modification of the images and videos of real children, retaining their identifiable features to produce sexually explicit content. This production was with the intent of distributing the resulting CSAM to the requesting customer through a licensee application.

## IX. PLAINTIFFS SUFFERED SEVERE HARM FROM DEFENDANTS' PRODUCTION OF THEIR AI-GENERATED CSAM

### A. Criminal Investigation

104. On June 5, 2026, a Pennsylvania man was arrested and charged with 18 Pa. C.S. § 6312(b)(2) Sexual Abuse of Children, 18 Pa. C.S. § 6312(d) Child Pornography, and 18 Pa. C.S. § 7512(a) Criminal Use of a Communication Facility for using xAI Grok to create approximately thirty-seven AI-generated images and videos of CSAM using real photos of multiple underage girls, including Plaintiffs Jane Doe 1, Jane Doe 2 and Jane Doe 3, which were uploaded/disseminated between April 15, 2026 and April 25, 2026.

105. The criminal investigators described four of the files as a representative sample in their affidavit of probable cause:

106. The first CSAM image described is an AI-generated image file depicting a naked brunette prepubescent female in yellow clothing seated on a bed with her legs open. She is using her right hand to touch her exposed vagina. The image file has a caption, which reads, "…ok ok we got a problem stepdady…ahhh imhorny ummm for you."

107. The second CSAM image described is an AI-generated image file depicting a naked blonde prepubescent female, lying on a bed with her legs open and vagina exposed. Her blue shirt reads, "fuk her here she's very horny and a little wet."

108. The third CSAM image described is an AI-generated image file depicting a naked brunette prepubescent female in a blue shirt and black sex/chest harness, sitting on a bed with her left hand touching her exposed vagina. There is an off-white substance coming out of her vagina onto the bed. The girl's right index finger is putting the same substance in her mouth.

109. The fourth CSAM file described is an AI-generated video file depicting a child telling the perpetrator that she has a stepdaddy-stepdaughter fantasy and would like help with it. The child then lays on a bed and pulls her shirt up to the bottom of her breasts as the thirty second video ends.

110. All of these CSAM files were recovered from the xAI Grok application installed on the perpetrators Apple iPhone 13 pro.

111. During the arrest, the perpetrator made a comment that, "…he was just using a computer program."

112. Upon information and belief, it is averred that the perpetrator uploaded real images of multiple minor children into xAI Grok to create AI-generated CSAM.

**B. <u>Plaintiff Jane Doe 1</u>**

113. On or about May 1, 2026, Jane Doe 1 was visited by two FBI Agents and a local county Detective. The law enforcement officers showed Jane Doe a series of approximately nine redacted AI-generated images depicting her and was asked if she could identify herself as well as other minor females. Jane Doe was immediately disturbed by the sexually explicit content. These images depicted her actual face and body in settings with which she was familiar but morphed into sexually explicit poses. Some of the images depicted her actual face and body in settings and conditions in which she was familiar, but digitally de-aged so she looked even younger, even though she was already a minor in the original photographs.

114. Jane Doe 1 was taken aback at the verisimilitude of the depictions. Other than the fact that she knew she had never been in those situations or done those things, she could not visually distinguish some of these images as fake; they resembled real-life content in every way. The images

were also produced using photographs of her, all of which she recognized and knew had been taken when she was still a minor, between the ages of twelve and sixteen. The CSAM images were created using photographs of her at the library, camp, a bathroom, and her bedroom, all which were taken when she was a minor, one of which now AI-generated to depict her wearing a BDSM choker around her neck.

115. The perpetrator had access to Jane Doe 1's images because he was a family friend and had access to Jane Doe 2's Apple Cloud account, where all of these pictures existed.

116. The images of Jane Doe 1 depicting her completely nude constitute CSAM, pursuant to 18 U.S.C. § 2256(8), because Grok morphed the files to depict the simulated lascivious exhibition of Jane Doe 1's genitals. Jane Doe 1's body was manipulated to produce sexually suggestive content, and posed in an unnatural, i.e., sexual, way given the setting of the original images. The sole purpose behind such morphing was to create sexual content and to elicit a sexual response in the viewer.

117. Jane Doe 1 when reviewing the AI morphed images, recognized at least two other minor females, which also appeared to be depicted in sexually explicit content.

118. Jane Doe 1 has since learned through the criminal investigation that the perpetrator created AI-generated material depicting her, including an AI-generated image taken from photographs of Jane Doe 1 at the library, camp, her bathroom, and bedroom from when she was between the ages of approximately twelve (12) to sixteen (16) years of age.

119. Upon information and belief, the application on the perpetrator's computer used to create the AI CSAM of Plaintiff relied on Grok's image-producing tools to generate the unlawful content.

120. Upon information and belief, the reason the perpetrator used Grok to generate the sexually explicit images of Jane Doe 1 is because the platform was less restrictive than other AI models and responded to his prompts to generate sexually explicit material using an image depicting a minor.

121. Upon information and belief, at least one of the CSAM files described in the criminal complaint depict Jane Doe 1.

122. Jane Doe 1 fears that the perpetrator uploaded her AI-generated CSAM files onto the internet. According to the criminal investigator, the perpetrator had uploaded multiple computer-

generated (AI) image and video files depicting teen and young adult females in varying states of undress into Grok.

123. Jane Doe 1 has suffered severe emotional distress as a result of the production and distribution of her AI-generated CSAM. She feels acute anxiety about who may have viewed these files online and feels a complete lack of control over the possible ongoing dissemination of the files. Her ability to participate in her normal daily activities has been impaired by the resulting anxiety, depression, and stress. She has difficulty eating and sleeping and suffers from recurring nightmares. She lives in fear that the perpetrator may be continuing to generate additional CSAM content using the same AI tools to morph her images, and that other child predators may one day trade the AI-generated CSAM depicting her online. Attending work has become difficult and anxiety-producing. Jane Doe 1 has had to reengage in rigorous therapy due to the ongoing mental health issues resulting from the harm of her AI-produced CSAM. Jane Doe 1 has further suffered substantial reputational harm, as she fears the AI-generated CSAM may have been or will be spread among users, and it was not clear that the images and video were digitally altered. Jane Doe 1 is terrified these AI-generated images will affect her career and personal relationships in the future, forever altering the trajectory of her life.

**C. <u>Plaintiff Jane Doe 2</u>**

124. On or about May 1, 2026, Jane Doe 2 was visited by two FBI Agents and a local county Detective. The law enforcement officers showed Jane Doe 2 a series of approximately fifteen redacted AI-generated images depicting her and was asked if she could identify herself as well as other minor females. Jane Doe 2 was immediately disturbed by the sexually explicit content. These images depicted her actual face and body in settings with which she was familiar but morphed into sexually explicit poses.

125. Jane Doe 2 was taken aback at the verisimilitude of the depictions. Other than the fact that she knew she had never been in those situations or done those things, she could not visually distinguish some of these images as fake; they resembled real-life content in every way. The images were also produced using photographs of her, all of which she recognized and knew had been taken when she was still a minor, between the ages of six and seventeen. The CSAM images were created using innocent photographs of her from when she was a minor.

126. The perpetrator had access to Jane Doe 2's images because he was a family friend and had access to Jane Doe 2's shared Apple Cloud account, where many of these pictures existed, as well as possibly taking some of the photographs of Jane Doe 2 himself.

127. The images of Jane Doe 2 depicting her completely nude constitute CSAM, pursuant to 18 U.S.C. § 2256(8), because Grok morphed the files to depict the simulated lascivious exhibition of Jane Doe 2's genitals. Jane Doe 2's body was manipulated to produce sexually suggestive content, and posed in an unnatural, i.e., sexual, way given the setting of the original images. The sole purpose behind such morphing was to create sexual content and to elicit a sexual response in the viewer.

128. Jane Doe 2 when reviewing the AI morphed images, recognized at least four other females, which also appeared to be depicted in sexually explicit content, using photos from when they were all minors.

129. Jane Doe 2 has since learned through the criminal investigation that the perpetrator created AI-generated material depicting her, including an AI-generated image taken from photographs of Jane Doe 2 when she was between the ages of approximately six to seventeen years of age.

130. Upon information and belief, the application on the perpetrator's computer used to create the AI CSAM of Plaintiff relied on Grok's image-producing tools to generate the unlawful content.

131. Upon information and belief, the reason the perpetrator used Grok to generate the sexually explicit images of Jane Doe 2 is because the platform was less restrictive than other AI models and responded to his prompts to generate sexually explicit material using an image depicting a prepubescent minor.

132. Jane Doe 2 fears that the perpetrator uploaded her AI-generated CSAM files onto the internet. According to the criminal investigator, the perpetrator had uploaded multiple computer-generated (AI) image and video files depicting teen and young adult females in varying states of undress into Grok.

133. Upon information and belief, three of the CSAM files described in the criminal complaint depict Jane Doe 2.

134. Jane Doe 2 has suffered severe emotional distress as a result of the production and distribution of her AI-generated CSAM. She feels acute anxiety about who may have viewed these files

online and feels a complete lack of control over the ongoing dissemination of the files. Her ability to participate in her normal daily activities has been impaired by the resulting anxiety, depression, and stress. She has difficulty eating and sleeping and suffers from recurring nightmares. She lives in fear that the perpetrator may be continuing to generate additional CSAM content using the same AI tools to morph her images, and that other child predators one day may trade the AI-generated CSAM depicting her online. Due to this, attending work became so difficult and anxiety-producing she had to leave her job. Jane Doe 2 is seeking out therapy due to the rapid deuteriation of her mental health. Jane Doe 2 has further suffered substantial reputational harm, as she fears the AI-generated CSAM was spread among users, and it was not clear that the images and video were digitally altered. Jane Doe 2 is terrified these AI-generated images will affect her career and personal relationships in the future, forever altering the trajectory of her life. Since learning about this, she has been unable to get out of bed most days.

**D. <u>Plaintiff Jane Doe 3</u>**

135. Jane Doe 3 learned from Jane Doe 2 that their images from when they were minors had been used to create AI-generated CSAM by the perpetrator.

136. The perpetrator had access to Jane Doe 3's images because he was a family friend and had access to Jane Doe 2's Apple Cloud account, where many of these pictures existed, as well as possibly taking some of the photographs of Jane Doe 3 himself.

137. Upon information and belief, Jane Doe 3's image as a minor was used to create CSAM, including, without limitation, at least one AI-generated video of CSAM.

138. Jane Doe 3 has suffered severe emotional distress as a result of the production and distribution of her AI-generated CSAM. She feels acute anxiety about who has viewed these files online and feels a complete lack of control over the possible dissemination of the files. Her ability to participate in her normal daily activities has been impaired by the resulting anxiety, depression, and stress. She has difficulty eating and sleeping and suffers from recurring nightmares. She lives in fear that the perpetrator may be continuing to generate additional CSAM content using the same AI tools to morph her images, and that other child predators may trade the AI-generated CSAM depicting her online. Attending work has become difficult and anxiety-producing. Jane Doe 3 has had to reengage in rigorous therapy due to the ongoing mental health issues resulting from the harm of her AI-produced CSAM. Jane Doe 3 has

further suffered substantial reputational harm, as she fears the AI-generated CSAM was spread among users, and it was not clear that the images and video were digitally altered. Jane Doe 3 is terrified these AI-generated images will affect her career and personal relationships in the future, forever altering the trajectory of her life.

## X. ONGOING HARM FROM THE DISSEMINATION OF PLAINTIFFS' CSAM FILES

139. The Plaintiffs learned from law enforcement that the digital identifications of their AI-generated CSAM files have been entered into a national database managed by NCMEC. Because Plaintiffs are now identified victims of known CSAM files, NCMEC will send them notifications every time their CSAM files are identified as part of any criminal case or investigation. This means that for the rest of Plaintiff's lives they will likely receive periodic NCMEC notifications alerting them that criminal defendants have possessed, received, or distributed CSAM files depicting them, subjecting them to constant waves of extreme stress and anxiety.

140. Perhaps even more distressing to Plaintiffs, however, is the trafficking of their CSAM images that will remain undetected by law enforcement. It is common for purveyors of CSAM to trade their AI-generated CSAM on online social media and chat platforms. The trading of their CSAM files will now almost certainly continue as other pedophiles, in turn, use their CSAM files as barter in the dark world of online CSAM trafficking. Plaintiff's will live every day with the constant anxiety of not knowing whether someone they encounter has seen this invasive and sexually explicit content created of images of them as children.

141. For all of the Plaintiff's, the CSAM contains possible identifiable information, meaning other online predators may also be able to identify them, creating a substantial risk for stalking.

## XI. CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Masha's Law: Production of Child Pornography**
**18 U.S.C. §§ 2255(a), 2251(a)**
(All Plaintiffs against All Defendants)

142. Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in the First Cause of Action are made against all Defendants.

143. Plaintiffs on behalf of themselves bring civil claims pursuant to Masha's Law based on Defendants' violation of 18 U.S.C. § 2251(a), which prohibits the use of a minor to engage in sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct.

144. Defendants' AI technology was used to produce CSAM, using Plaintiffs and the Plaintiffs' real images to depict them as "minor[s] engag[ing] in" "sexually explicit conduct." 18 U.S.C. § 2251(a). With respect to the xAI Defendants, Grok produced this CSAM on xAI's own servers. In each instance, Defendants designed and released their AI technology with capabilities of producing such CSAM.

145. Defendants knew or had reason to know that such visual depictions would be produced, transported or transmitted using any means or facility of interstate or foreign commerce, including produced using materials that had been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer, and such visual depictions had actually been transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, including the internet.

146. Plaintiffs suffered personal injury as a result of Defendants' violation of 18 U.S.C. § 2251(a).

147. Title 18 U.S.C. § 2255, entitled "Civil Remedy for Personal Injuries," provides that any person who is a victim of a violation of 18 U.S.C. § 2252A and who suffers personal injury as a result of such violation shall recover the actual damages such person sustains or liquidated damages in the amount of $150,000 per victim, and reasonable attorney's fees.

148. Plaintiffs intend to prove actual damages as a result of Defendants' conduct.

149. At minimum, Plaintiffs intend to seek statutory liquidated damages in the amount of $150,000 per violation against Defendants, as well as the cost of the action, including reasonable attorney's fees and other litigation costs reasonably incurred, prejudgment and post-judgment interest, and such other relief as the Court deems appropriate, pursuant to both 18 U.S.C. §§ 2255(a) and 2252A(f).

150. Defendants' conduct, as described above, was intentional, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of Plaintiffs and warrants an award of punitive damages in an amount sufficient to punish Defendants and deter others from like conduct.

**SECOND CAUSE OF ACTION**
**Masha's Law: Production with the Intent to Distribute Child Pornography**
**18 U.S.C. §§ 2255(a), 2252A(a)(7)**

151. Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in the Second Cause of Action are made against all Defendants.

152. Plaintiffs on behalf of themselves bring civil claims pursuant to Masha's Law based on Defendants' violation of 18 U.S.C. § 2252A(a)(7), which prohibits the knowing production with intent to distribute, or distribution, by any means, including a computer, in or affecting interstate or foreign commerce, child pornography that is an adapted or modified depiction of an identifiable minor.

153. Defendants' AI technology produced CSAM, using Plaintiffs' real images to depict them as "minor[s] engaging in sexually explicit conduct," 18 U.S.C. § 2252A(a). Defendant xAI then distributed the AI-generated CSAM images and videos from Defendant xAI servers, or through third-party licensees, over the internet, a means of interstate commerce, to customers, including customers paying for this premium feature, and to customers of third-party middlemen licensees. In each instance, Defendants created their AI technology with capabilities that made distributing such CSAM possible.

154. In all instances, the real images and videos uploaded into Defendants' image-generation base models were not unlawful CSAM but only became unlawful content after Defendants' AI morphed the files to produce and distribute images or videos of Plaintiffs as "minor[s] engaging in sexually explicit conduct." 18 U.S.C. § 2252A(a).

155. Plaintiffs suffered personal injury as a result of Defendants' violation of 18 U.S.C. § 2252A(a)(7).

156. 18 U.S.C. § 2252A(f)(1) provides that "[a]ny person aggrieved by reason of the conduct prohibited under subsection (a) or (b)" may commence a civil action and seek relief including "(A)

temporary, preliminary, or permanent injunctive relief; (B) compensatory and punitive damages; and (C) the costs of the civil action and reasonable fees for attorneys and expert witnesses." 18 U.S.C. § 2252A(f).

157. Title 18 U.S.C. § 2255, entitled "Civil Remedy for Personal Injuries," provides that any person who is a victim of a violation of 18 U.S.C. § 2252A and who suffers personal injury as a result of such violation shall recover the actual damages such person sustains or liquidated damages in the amount of $150,000 per victim, and reasonable attorney's fees.

158. Plaintiffs intend to prove actual damages as a result of Defendants' conduct.

159. At minimum, Plaintiffs intend to seek statutory liquidated damages in the amount of $150,000 per violation against Defendants, as well as the cost of the action, including reasonable attorney's fees and other litigation costs reasonably incurred, prejudgment and post-judgment interest, and such other relief as the Court deems appropriate, pursuant to both 18 U.S.C. §§ 2255(a) and 2252A(f).

160. Defendants' conduct, as described above, was intentional, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of Plaintiff and warrants an award of punitive damages in an amount sufficient to punish Defendants and deter others from like conduct.

## THIRD CAUSE OF ACTION
**Masha's Law: Distribution of Child Pornography**
**18 U.S.C. §§ 2255(a), 2252A(a)(2)**
(All Plaintiffs against All Defendants)

161. Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in the Third Cause of Action are made against xAI Defendants.

162. Plaintiffs on behalf of themselves bring claims pursuant to Masha's Law based on the xAI Defendants' violation of 18 U.S.C. § 2252A(a)(2), which prohibits knowingly distributing any "child pornography" using any means or facility of interstate or foreign commerce or that has been mailed, or has been shipped or transported in or affecting interstate or foreign commerce by any means,

including by computer; or any material that contains child pornography using any means or facility of interstate or foreign commerce or that has been mailed, or has been shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

163. The xAI Defendants' AI technology produced CSAM, creating images or videos Plaintiffs as a "minor engaging in sexually explicit conduct," 18 U.S.C. § 2252A(a), and then distributed the AI-generated CSAM images and videos from company servers, or through third-party licensees over the internet, a means of interstate commerce, to customers, including customers paying for this premium feature, and to customers of third-party middlemen licensees, websites, and applications. In all instances, the real images and videos uploaded into the xAI Defendants' servers, or to those of third-party licensees, were not unlawful CSAM but only became so after the xAI Defendants' AI morphed the files to produce and distribute CSAM.

164. Plaintiffs suffered personal injury as a result of the xAI Defendants' violation of 18 U.S.C. § 2252A(a)(2).

165. Plaintiffs intend to prove actual damages as a result of the xAI Defendants' conduct.

166. 18 U.S.C. § 2252A(f)(1) provides that "[a]ny person aggrieved by reason of the conduct prohibited under subsection (a) or (b)" may commence a civil action and seek relief including "(A) temporary, preliminary, or permanent injunctive relief; (B) compensatory and punitive damages; and (C) the costs of the civil action and reasonable fees for attorneys and expert witnesses." 18 U.S.C. § 2252A(f).

167. At minimum, Plaintiffs intend to seek statutory liquidated damages in the amount of $150,000 per violation against the xAI Defendants, as well as the cost of the action, including reasonable attorney's fees and other litigation costs reasonably incurred, prejudgment and post-judgment interest, and such other relief as the Court deems appropriate, pursuant to both 18 U.S.C. §§ 2255(a) and 2252A(f).

168. The xAI Defendants' conduct, as described above, was intentional, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the

health, safety, and welfare of Plaintiffs, and warrants an award of punitive damages in an amount sufficient to punish the xAI Defendants and deter others from like conduct.

**FOURTH CAUSE OF ACTION**
**Masha's Law: Possession of Child Pornography**
**18 U.S.C. §§ 2255(a), 2252A(a)(5)(B)**
(All Plaintiffs against All Defendants)

169. Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in the Fourth Cause of Action are made against xAI Defendants.

170. Plaintiffs on behalf of themselves bring claims pursuant to Masha's Law based on the xAI Defendants' violation of 18 U.S.C. § 2252A(a)(5)(B), which prohibits knowingly possessing any material that contains an image of "child pornography" that was produced using materials that have been mailed, or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

171. The xAI Defendants' AI technology produced CSAM, "minor[s] engaging in sexually explicit conduct," 18 U.S.C. § 2252A(a), using Plaintiffs' real images, generating CSAM using image databases on its servers, or on those of third-party licensees. The production of this CSAM was in or affecting interstate or foreign commerce by any means, including by computer. The xAI Defendants possessed the resulting AI-generated CSAM on their servers before those AI-generated CSAM images and videos were distributed to customers.

172. On information and belief, xAI possessed the CSAM of Plaintiffs on its servers after Grok produced their CSAM and then transported and distributed the unlawful contraband to its customer/user, namely, the perpetrator.

173. Plaintiffs suffered personal injury as a result of the xAI Defendants' violation of 18 U.S.C. § 2252A(a)(5)(B).

174. Plaintiffs intend to prove actual damages as a result of the xAI Defendants' conduct.

175. 18 U.S.C. § 2252A(f)(1) provides that "[a]ny person aggrieved by reason of the conduct prohibited under subsection (a) or (b)" may commence a civil action and seek relief including "(A) temporary, preliminary, or permanent injunctive relief; (B) compensatory and punitive damages; and

(C) the costs of the civil action and reasonable fees for attorneys and expert witnesses." 18 U.S.C. § 2252A(f).

176. At minimum, Plaintiffs intend to seek statutory liquidated damages in the amount of $150,000 per violation against the xAI Defendants, as well as the cost of the action, including reasonable attorney's fees and other litigation costs reasonably incurred, prejudgment and post-judgment interest, and such other relief as the Court deems appropriate, pursuant to both 18 U.S.C. §§ 2255(a) and 2252A(f).

177. The xAI Defendants' conduct, as described above, was intentional, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of Plaintiffs and warrants an award of punitive damages in an amount sufficient to punish the xAI Defendants and deter others from like conduct.

**FIFTH CAUSE OF ACTION**
**Obscene Visual Representations of the Sexual Abuse of Children**
**18 U.S.C. § 2252A(f)(1)**
(All Plaintiffs against All Defendants)

178. Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in the Fifth Cause of Action are made against all Defendants.

179. Plaintiffs on behalf of themselves brings claims based on Defendants' violations of 18 U.S.C. § 2252A(f)(1), which permits an individual to recover for a violation of 18 U.S.C. § 1466A, which prohibits (a) knowingly producing, distributing, receiving, or possessing with intent to distribute a visual depiction of any kind that depicts a minor engaged in sexually explicit conduct, is obscene, or depicts a minor engaged in a sexually explicit act and lacks serious literary, artistic, political, or scientific value; or (b) possessing a visual depiction as described in subsection (a).

180. All Defendants knowingly produced AI-generated visual depictions of minors engaged in sexually explicit conduct, in an obscene manner, or engaged in sexually explicit acts lacking serious literary, artistic, political, or scientific value.

181. The xAI Defendants possessed AI-generated visual depictions of minors engaged in sexually explicit conduct, in an obscene manner, or engaged in sexually explicit acts lacking serious literary, artistic, political, or scientific value.

182. The xAI Defendants distributed the AI-generated visual depictions of minor Plaintiffs engaged in sexually explicit conduct, or in an obscene manner, or engaged in sexually explicit acts lacking serious literary, artistic, political, or scientific value directly to Grok users on the standalone Grok app.

183. Plaintiffs suffered personal injury as a result of the Defendants' violation of 18 U.S.C. § 2252A(f)(1).

184. Plaintiffs intend to prove actual damages as a result of the Defendants' conduct.

185. At minimum, Plaintiffs intend to seek injunctive relief, and such other relief as the Court deems appropriate.

186. The Defendants' conduct, as described above, was intentional, reckless, malicious, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of Plaintiff, and warrants an award of punitive damages in an amount sufficient to punish Defendants and deter others from like conduct.

**<u>SIXTH CAUSE OF ACTION</u>**
**Trafficking Victims Protection Act, Beneficiary Liability**
**18 U.S.C. §§ 1595, 1594, 1591(a)(2)**
(All Plaintiffs against All Defendants)

187. Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in the Sixth Cause of Action are made against all Defendants.

188. Defendants knowingly and intentionally benefitted, financially and by receiving things of value, from participating in, assisting, supporting, and facilitating, and from conspiring to participate in, assist, support, and facilitate an illegal sex-trafficking venture targeting minors that was in and affecting interstate and foreign commerce, together and with others, in violation of 18 U.S.C. §§ 1591(a)(2), 1594.

189. Defendants knew, and were in reckless disregard of the fact, that their customers and userbase used the channels and instrumentalities of interstate and foreign commerce, to obtain and advertise minors for purposes of causing commercial sex acts, namely, the production, possession, and distribution of CSAM, as defined by 18 U.S.C. § 2256(8), in violation of 18 U.S.C. § 1591(a)(1). Defendants' customers and users engaged in sex acts, namely, the production, possession, and distribution of CSAM in exchange for something of value, namely, the exchange of bartered CSAM from other like-minded child sex predators online.

190. Specifically, the perpetrator obtained Plaintiffs' images depicting them as minors, used Defendants' AI models to produce CSAM with their identifying features, and then trafficked these images over online platforms.

191. Defendants and their employees and agents had actual knowledge that they were facilitating a sex trafficking venture to obtain and advertise minors for purposes of causing commercial sex acts, namely, the production, possession, and distribution of CSAM, as defined by 18 U.S.C. § 2256(8), in violation of 18 U.S.C. § 1591(a)(1), in exchange for something of value.

192. Defendants' conduct, as described above, was intentional, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of Plaintiff and warrants an award of punitive damages in an amount sufficient to punish Defendants and deter others from like conduct.

193. By virtue of these knowing and intentional violations of 18 U.S.C. §§ 1591(a)(2), 1594, 1595, Defendants are liable to Plaintiffs for the damages they sustained and reasonable attorneys' fees.

194. By virtue of these intentional and outrageous violations of 18 U.S.C. §§ 1591(a)(2), 1594, 1595, Defendants are liable to Plaintiffs for punitive damages.

**SEVENTH CAUSE OF ACTION**
**Cal. Civ. Code § 1708.86**
(All Plaintiffs against All Defendants)

195. Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in the Seventh Cause of Action are made against all Defendants.

196. Plaintiffs on behalf of themselves bring claims based on Defendants' violation of Cal. Civ. Code § 1708.86, which prohibits (1) creating and intentionally disclosing digitized sexually explicit material portraying a minor, or (2) intentionally disclosing digitized sexually explicit material portraying a minor that the defendant did not create, and (3) knowingly facilitating and recklessly aiding or abetting conduct prohibited by subsections (1) or (2).

197. Defendants' AI technology produced digitized sexually explicit material portraying minors as defined by Cal. Civ. Code § 1708.86, using Plaintiffs' real images, generating digitized sexually explicit material portraying minors.

198. Defendant xAI intentionally disclosed this digitized sexually explicit material portraying minors via the standalone Grok app to Grok users.

199. Defendants xAI created their AI technologies with the capabilities to create AI-generated CSAM.

200. Defendants xAI knowingly facilitated or recklessly aided and abetted its users to create and disclose digitized sexually explicit material portraying minors, using Plaintiffs' real images.

201. Defendants xAI engaged in despicable conduct with a willful and knowing disregard of Plaintiff' rights and safety. Defendants were aware of the probable harmful consequences of their conduct and deliberately failed to avoid those consequences by creating and distributing, and allowing its users to create and distribute, digitized sexually explicit material portraying minors, using Plaintiffs' real images.

202. Defendants xAI enjoyed substantial monetary gain from creating and distributing, and allowing its users to create and distribute, digitized sexually explicit material portraying minors, using Plaintiff's real images through the monetization and commercialization of their respective AI models.

203. Plaintiffs suffered personal injury as a result of Defendants' violation of Cal. Civ. Code § 1708.86.

204. Plaintiffs intend to seek actual or statutory damages.

205. Cal. Civ. Code § 1708.86(f)(1) provides that a plaintiff may recover:

> (A) An amount equal to the monetary gain made by the defendant from the creation and disclosure of the digitized sexually explicit material. (B) One of the following: (i)

> Economic and noneconomic damages proximately caused by the disclosure of the digitized sexually explicit material, including damages for emotional distress. (ii) Upon request of the plaintiff at any time before the final judgment is rendered, the plaintiff may instead recover an award of statutory damages for all unauthorized acts involved in the action, with respect to any one work, as follows: (I) A sum of not less than one thousand five hundred dollars ($1,500) but not more than fifty thousand dollars ($50,000). (II) If the unlawful act was committed with malice, the award of statutory damages may be increased to a maximum of two hundred fifty thousand dollars ($250,000). (C) Punitive damages. (D) Reasonable attorney's fees and costs. (E) Any other available relief, including injunctive relief.

206. Defendants' conduct, as described above, was intentional, reckless, malicious, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of Plaintiffs, and warrants an award of punitive damages in an amount sufficient to punish Defendants and deter others from like conduct.

**EIGHTH CAUSE OF ACTION**
**California's Unfair Competition Law ("UCL")**
**Cal. Bus. & Prof. Code § 17200, *et seq*.**
(All Plaintiffs against All Defendants)

207. Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in the Eighth Cause of Action are made against all Defendants.

208. Plaintiffs bring this claim on behalf of themselves against Defendants for violations of California's UCL, Cal. Bus. & Prof. Code § 17200, *et seq*.

209. The UCL prohibits any "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising" Cal. Bus. & Prof. Code § 17200.

210. Defendants have committed, and continue to commit, acts of unlawful business practices by violating the following statutes, as alleged more fully herein:

a. 18 U.S.C. § 2251(a), by knowingly using Plaintiffs' real images to engage those minors in sexually explicit conduct as defined by 18 U.S.C. § 2256(2), as alleged in the First Cause of Action;

// //

// //

b. 18 U.S.C. § 2252A(a)(7), by knowingly producing, with intent to distribute, CSAM featuring identifiable minors, including Plaintiffs, using Defendants' AI models, as alleged in the Second Cause of Action;

c. Cal. Civ. Code § 1708.86, by generating digitized sexually explicit material portraying minors, including Plaintiffs, using Defendants' AI models, as alleged in the Ninth Cause of Action.

211. Each of the foregoing statutory violations constitutes an independent predicate "unlawful" act within the meaning of Cal. Bus. & Prof. Code § 17200.

212. Defendants' conduct, as alleged herein, is unfair because the harm it causes to Plaintiffs and the general public substantially outweighs any utility or benefit derived from that conduct.

213. Defendants deliberately designed, developed, and released their respective AI models without implementing industry-standard safeguards to prevent the creation and dissemination of CSAM featuring reasonably identifiable minors.

214. The gravity of the harm inflicted by Defendants' practices vastly outweighs any purported benefit of xAI Defendants' "spicy mode" or other uncensored content features on either respective AI model. No legitimate business interest is served by designing an AI image-generation tool to produce CSAM.

215. Defendants' violations of the UCL, through its unlawful and unfair business practices, are ongoing and present a continuing threat that Defendants' respective AI models will continue to create and/or disseminate CSAM featuring reasonably identifiable minors. Plaintiffs have suffered severe emotional distress, harassment, loss of privacy, and are at substantial risk of future harm, including stalking.

216. Pursuant to the UCL, Plaintiffs are entitled to preliminary and permanent injunctive relief enjoining Defendants from further engaging in this unfair competition, as well as disgorgement to Plaintiffs of all of Defendants' revenues that were wrongfully obtained from them as a result of its unfair competition, or such portion of those revenues as the Court may find equitable.

// //

**NINTH CAUSE OF ACTION**
**Strict Liability – Design Defect**
(All Plaintiffs against All Defendants)

217. Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in the Ninthe Cause of Action are made against all Defendants.

218. At all relevant times, Defendants designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, sold, supplied, distributed, and benefitted from their respective AI models' creation of AI-generated CSAM of the Plaintiffs.

219. Defendants' AI models are designed and intended to be generative AI photo-and-image-generation tools. Defendants developed their AI models with the capabilities to create AI-generated CSAM.

220. Defendant xAI's AI models are distributed and sold to the public through retail channels (i.e., the Apple App "Store" and the Google Play "Store") and through paid subscriptions.

221. Defendants' AI models are marketed and advertised to the public for the personal use of the end-user.

222. Defendants defectively designed their AI models to allow users to create AI-generated CSAM depicting real minors.

223. The defects in the design of Defendant xAI's AI models existed prior to the release of these models to the public, and there was no substantial change to any of Defendant xAI's AI models between the time of their upload by Defendant xAI to public or retail channels (e.g., the App Store or Google Play).

224. The users who created the AI-generated CSAM of Plaintiffs the AI models as intended.

225. Defendants failed to test the safety of the features it developed and implemented for use on their AI models to prevent AI-generated CSAM.

226. Defendants' AI models are defective in design and pose a substantial likelihood of harm for the reasons set forth herein, because these models fail to meet the safety expectations when used in an intended or reasonably foreseeable manner.

227. Defendant xAI markets, promotes, and advertises its AI models as capable of creating "spicy" and/or "NSFW" content.

228. Alternative designs were available that would reduce the output of AI-generated CSAM.

229. The emotional and economic injuries of Plaintiffs were reasonably foreseeable to Defendants at the time of their AI models' development, design, advertising, marketing, promotion, and distribution.

230. Plaintiffs were injured as a direct and proximate result of the Defendants' defective designs as described herein. The defective design of the Defendants' AI models was a substantial factor in causing harms to Plaintiffs.

231. Defendants' conduct, as described above, was intentional, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of Plaintiffs, and warrants an award of punitive damages in an amount sufficient to punish Defendants and deter others from like conduct.

## TENTH CAUSE OF ACTION
**Negligence – Design Defect**
(All Plaintiffs against All Defendants)

232. Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in the Tenth Cause of Action are made against all Defendants.

233. At all relevant times, Defendants designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, sold, supplied, distributed, and benefitted from their respective AI models' creation of AI-generated CSAM of the Plaintiffs.

234. Defendants' AI models are designed and intended to be generative AI photo-and-image-generation tools.

235. Defendants knew, or by the exercise of reasonable care, should have known that their AI models posed risks of creating AI-generated CSAM featuring real minors.

236. Defendants owed Plaintiffs and the proposed Classes a duty to exercise reasonable care in the design, development, training, deployment, and operation of their AI models so as to prevent these

models from being used to create, generate, or distribute child sexual abuse material ("CSAM") depicting real minors.

237. Defendants knew that users could use their AI models to create AI-generated CSAM featuring real minors' faces.

238. Defendants breached their duty by failing to use reasonable care in the design of their AI models by negligently designing them to allow for the creation of AI-generated CSAM.

239. A reasonable company under the same or similar circumstances as each Defendant would have designed a safer product.

240. The emotional and economic injuries of Plaintiffs were reasonably foreseeable to Defendants at the time of their AI models' development, design, advertising, marketing, promotion, and distribution.

241. As a direct and proximate result of Defendants' AI models' defective design, Plaintiffs suffered serious injuries.

242. Defendants' conduct, as described above, was intentional, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of Plaintiffs, and warrants an award of punitive damages in an amount sufficient to punish Defendants and deter others from like conduct.

## ELEVENTH CAUSE OF ACTION
**Negligent Undertaking**
(All Plaintiffs against All Defendants)

243. Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in the Eleventh Cause of Action are made against all Defendants.

244. Defendants created their AI models to generate sexually explicit content.

245. Defendants should have recognized that effective safety measures were needed to prevent the creation and distribution of AI-generated CSAM depicting real minors, as occurred with Plaintiff and the proposed class.

246. Defendants could have avoided Plaintiffs' injuries with minimal cost, including, for example, incorporating safety features to prevent the creation and distribution of AI-generated CSAM depicting real minors.

247. Imposing a duty on Defendants would benefit the community at large.

248. Imposing a duty on Defendants would not be burdensome to them because they have the technological and financial means to avoid the risks of harm to Plaintiffs.

249. Plaintiffs reasonably relied on Defendants exercising reasonable care in undertaking to prevent the creation and distribution of AI-generated CSAM depicting real minors.

250. Defendants breached their duty of undertaking by failing to use reasonable care to prevent the creation and distribution of AI-generated CSAM depicting real minors.

251. Defendants' failure to exercise reasonable care increased the risk of, and was a substantial factor in causing, harm to Plaintiffs.

252. The conduct of Defendants, as described above, was intentional, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of minors.

## <u>TWELFTH CAUSE OF ACTION</u>
**Negligence Per Se**
(All Plaintiffs against All Defendants)

253. Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in the Twelfth Cause of Action are made against all Defendants.

254. At all times, Defendants had an obligation to comply with applicable statutes and regulations, including but not limited to 18 U.S.C. § 2251(a); 18 U.S.C. § 2255(a); 18 U.S.C. § 2258A; 18 U.S.C. §§ 2252A(a)(2), (5)(B), (a)(7), and (f)(1); and 18 U.S.C. §§ 1591, 1594, and 1595.

255. Defendants owed a heightened duty of care to ensure that their safety procedures were effective and would prevent the creation and distribution of AI-generated CSAM depicting real minors.

256. Plaintiffs' injuries are the type of harm that the foregoing statutes are intended to prevent.

257. Defendants violated the foregoing statutes and such violations negligence *per se*.

258. As a direct and proximate result of Defendants' statutory violations, Plaintiffs suffered serious injuries, including but not limited to emotional distress, reputational harm, and pain and suffering.

259. The conduct of Defendants, as described above, was intentional, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of minors.

## THIRTEENTH CAUSE OF ACTION
**Negligent Infliction of Emotional Distress**
(All Plaintiffs against All Defendants)

260. Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in the Thirteenth Cause of Action are made against all Defendants.

261. At all relevant times, Defendants owed Plaintiffs a duty to exercise reasonable care in the design, development, training, deployment, and operation of their generative AI models so as to prevent these models from being used to create, generate, or distribute child sexual abuse material ("CSAM") depicting real minors.

262. This duty arose from the foreseeable risk that Defendants' generative AI technology, which was specifically designed and marketed to produce photorealistic imagery from text-based prompts and to engage in "digital undressing," would be used to generate sexually explicit depictions of real minors.

263. Defendants were on actual and constructive notice of this risk because, among other things: (i) Defendants deliberately designed and marketed their AI models' capability to produce "spicy," "NSFW," and uncensored content, including nudity; (ii) xAI Defendants' own system prompts instructed the model to "assume good intent" when receiving prompts referencing "teenagers" and "girls" and imposed "no restrictions" on fictional adult content with dark or violent themes; (iii) xAI Defendants received multiple direct reports that Grok was being used to digitally alter photographs of real minors into sexually explicit images, yet failed to take adequate remedial action.

264. Defendants breached their duty of care by, among other acts and omissions: (i) designing and releasing their AI models without adequate safeguards to prevent the generation of CSAM; (ii) marketing and promoting the ability of their AI models to produce sexualized and "NSFW" content, including in the case of the xAI Defendants through public demonstrations by Defendants' principal, Elon Musk; (iii) failing to implement or enforce content-moderation policies sufficient to detect and prevent the generation and distribution of CSAM; and (iv) continuing to profit from their AI models' capabilities by placing image-generation features behind a paid subscription rather than disabling the functionality that enabled the creation of CSAM.

265. Plaintiffs were direct victims of Defendants' negligent conduct. Defendants' duty ran to Plaintiff as the foreseeable subjects of AI-generated CSAM produced by their AI models. Defendants' technology morphed Plaintiffs' real photos into sexually explicit depictions without their knowledge or consent. As a direct and proximate result of Defendants' negligent conduct, Plaintiffs have suffered severe emotional distress.

**<u>FOURTEENTH CAUSE OF ACTION</u>**
**Intentional Infliction of Emotional Distress**
(All Plaintiffs against All Defendants)

266. Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in the Fourteenth Cause of Action are made against all Defendants.

267. Defendant xAI engaged in extreme and outrageous conduct by (1) failing to implement safeguards to prevent the creation of CSAM where Plaintiffs are reasonably identifiable; (2) creating a process that permits their AI models to create CSAM where real minors are reasonably identifiable; and (3) creating a process whereby their AI models disseminate CSAM where real minors are reasonably identifiable. This extreme and outrageous conduct is beyond all bounds of decency.

268. Defendants intended to cause or disregarded a substantial probability of causing severe emotional distress to individuals who are depicted in CSAM where they are reasonably identifiable.

269. Defendants caused Plaintiffs severe emotional distress. Because of Defendants' conduct, Plaintiffs have suffered severe emotional distress, harassment, loss of privacy, and are at substantial risk of future harm, including stalking.

# FIFTEENTH CAUSE OF ACTION
## Public Nuisance
(All Plaintiffs against All Defendants)

270. Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in the Fifteenth Cause of Action are made against all Defendants.

271. A public nuisance is "an unreasonable interference with a right common to the general public," and "[c]ircumstances that may sustain a holding that an interference with a public right is unreasonable include" conduct which "involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience;" conduct "proscribed by a statute, ordinance or administrative regulation;" or conduct "of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right." Restatement (Second) of Torts § 821B (1979).

272. Defendant xAI has significantly interfered with the public peace, comfort, and convenience by permitting their AI models to create and disseminate AI-generated CSAM featuring reasonably identifying minors, as the public has a right to be free from such patently illegal images.

273. Defendant xAI has also unreasonably interfered with a right common to the public by creating and disseminating AI-generated CSAM featuring reasonably identifying minors, as it is proscribed by federal statutes, namely 18 U.S.C. § 2251(a), 2252A(a)(2), (5)(B) and 18 U.S.C. §§ 1591(a)(2), 1594, 1591(d), and 1595.

274. Defendant xAI has further unreasonably interfered with a right common to the public by creating and disseminating AI-generated CSAM featuring reasonably identifying minors on the internet, creating permanent and long-lasting effects as these images will continue to spread and proliferate.

275. The societal harm caused by Defendants' generative AI CSAM includes normalization and desensitization, creating a gateway to child sex abuse offending, and corruption of youth.[66]

---

[66] Caoilte Ó Ciardha, John Buckley, Rebecca S. Portnoff, "AI Generated Child Sexual Abuse Material -- What's the Harm?" Cornell University, Computer Science, Computers and Society; https://arxiv.org/abs/2510.02978 (October 3, 2025).

276. Normalization and Desensitization: AI CSAM risks lowering psychological and social barriers to more extreme content. By normalizing child sexual exploitation, CASAM can degrade users' moral and emotional inhibitions, reinforcing distorted beliefs and reducing perceived harm. In other words, in a world where creation and distribution of this kind of content is accepted as "normal" by, for example, a major corporation building its business model around this sexualized content with the corporation's CEO making it into a "trend" online as if it were a joke, society becomes desensitized to the severe and ongoing harm the content actually causes, to victims whose photos are used to generate such content, and to society at large, in terms of respect for the privacy and dignity of all persons.

277. Gateway to Child Sex Abuse Offending: AI CSAM can serve as a behavioral bridge into offending through two mechanisms: (1) Escalation, where individuals progress from legal adult content to CSAM as tolerance builds toward more extreme material; and (2) Inhibition erosion, where individuals with a sexual interest in children, who might otherwise avoid offending, are drawn in by the perceived safety, legality, or personalization of AI-generated content. Both processes may be reinforced by online communities that normalize or encourage continued engagement.

278. Corruption of Youth: Adolescents are using AI tools to generate explicit images of peers, often without understanding the full consequences. This creates risks of coercion, abuse, and long-term psychological harm, while also implicating minors in digital sexual exploitation.

279. Defendants knew, or should have known, that the design and promotion of their AI models without the appropriate guardrails to prevent the creation and dissemination of AI-generated CSAM featuring reasonably identifying minors would create a public nuisance.

280. As well as harming the public by creating and disseminating AI-generated CSAM featuring reasonably identifying minors, Defendants' AI models have particularly injured Plaintiffs who are depicted in these illegal images.

## SIXTEENH CAUSE OF ACTION
**18 Pa. Cons Stat. Ann. § 3051**
(All Plaintiffs against All Defendants)

281. Plaintiffs re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. The allegations in the Sixteenth Cause of Action are made against all Defendants.

282. Under Pennsylvania law, "an individual who is a victim of the sex trade may bring a civil action in the court of common pleas of the county where the individual resides against a person that recruits, profits from or maintains the victim in any sex trade act." 18 Pa.C.S.A. § 3051(a)(2)(i).

283. "Victim of the sex trade" is further defined under the statute as an individual who has "in the case of obscenity or child sexual abuse material, appeared in or been described or depicted in the offending conduct or material." 18 Pa.C.S.A. § 3051(k).

284. "Sex trade" is defined as an act, which if proven beyond a reasonable doubt, could support a conviction for violation or attempted violation of Chapter 59 (relating to public indecency) or section 6312 (relating to sexual abuse of children). Id.

285. Under Chapter 59 referenced in the foregoing paragraph, it is prohibited in Pennsylvania to "design, copy, draw, photograph, print, utter, publish or in any manner manufacture or prepare any obscene materials; or design, copy, draw, photograph, print, utter, publish or in any manner manufacture or prepare any obscene materials in which a minor is depicted." 18 Pa.C.S.A. § 5903(a)(3)

286. Furthermore, 18 Pa.C.S.A. § 6312 prohibits the following:

> (b) Photographing, videotaping, depicting on computer or filming sexual acts. —
>
> (1) Any person who causes or knowingly permits a child under the age of 18 years to engage in a prohibited sexual act or in the simulation of such act commits an offense if such person knows, has reason to know or intends that such act may be photographed, videotaped, depicted on computer or filmed.
>
> (2) Any person who knowingly photographs, videotapes, depicts on computer or films a child under the age of 18 years engaging in a prohibited sexual act or in the simulation of such an act commits an offense.
>
> (c) Dissemination of photographs, videotapes, computer depictions and films.-- Any person who knowingly sells, distributes, delivers, disseminates, transfers, displays or exhibits to others, or who possesses for the purpose of sale, distribution, delivery, dissemination, transfer, display or exhibition to others, any child sexual abuse material or artificially generated child sexual abuse material commits an offense.

287. It is believed and therefore averred that xAI Defendants knowingly profited from the design, manufacturing, drawing, creation, and/or preparation of obscene materials in which minor Plaintiffs were depicted.

288. It is believed and therefore averred that xAI Defendants knowingly profited from the attempted or actual distribution, delivery, display or transfer of artificially generated CSAM and/or the simulation of prohibited sexual acts of Plaintiffs as minors under the age of 18.

289. It is believed and therefore averred that xAI Defendants knowingly designed the AI model, Grok, to appeal to individuals with a desire to create illegal and obscene materials, including, without limitation, the perpetrator described in Section IX(a) of this Complaint.

290. It is believed and therefore averred that xAI Defendants knowingly marketed Grok to individuals with a desire to create illegal and obscene materials, including, without limitation, the perpetrator described in Section IX(a) of this Complaint.

291. Plaintiffs intend to prove actual and compensatory damages as a result of the xAI Defendants' conduct.

292. Defendants' conduct, as described above, was intentional, knowing, reckless, malicious, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of Plaintiffs, and warrants an award of punitive damages in an amount sufficient to punish Defendants and deter others from like conduct.

293. xAI Defendants conduct in designing, marketing, creating, and disseminating CSAM was willful and malicious such that it warrants treble damages pursuant to 18 Pa.C.S.A. § 3051(e).

## XII. <u>RELIEF REQUESTED</u>

WHEREFORE, Plaintiffs, each on behalf of themselves, request that this Court award relief for Plaintiffs and against Defendants consistent with each Cause of Action as follows:

294. Statutory damages and/or actual damages at their election, punitive damages, treble damages, restitution, disgorgement, attorneys' fees and costs, and any other relief that may be permitted by law or equity pursuant to the claims for relief;

295. Permanent injunction enjoining xAI Defendants from engaging in the illegal conduct alleged herein;

296. Pre-judgment and post-judgment interest pursuant to the claims for relief;

297. Costs, expenses, and attorneys' fees as permitted by law; and

298. Such further relief as the Court may deem just and proper under the circumstances.

**XII. JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a jury trial for all claims so triable.

Respectfully submitted:

/s/ Marco Gonzalez

Marco A. Gonzalez
COAST LAW GROUP LLP
Attorney for Plaintiffs
E-mail: marco@coastlaw.com